IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 6, 2012 Session

## WILLIAM GLENN WILEY v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 95-C-1918      Walter Kurtz, Senior Judge**

**No. M2012-00158-CCA-R3-PC - Filed January 7, 2013**

The petitioner, William Glenn Wiley, appeals the denial of post-conviction relief from his convictions for first degree felony murder and aggravated robbery, arguing that he is entitled to a new trial based on "the State's systematic late-disclosures of exculpatory evidence," which rendered his trial counsel presumptively ineffective under United States v. Cronic, 466 U.S. 648 (1984). In the alternative, he argues that he received ineffective assistance of counsel under the Strickland standard based on counsel's inadequate response to the late-disclosed evidence and failure to call two exculpatory witnesses at his trial. Finally, the petitioner argues that he is entitled to a new post-conviction evidentiary hearing because of the post-conviction court's denial of his request for a continuance and an order to have the potentially exculpatory fingerprint evidence analyzed. Following our review, we affirm the post-conviction court's denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JERRY L. SMITH and JOHN EVERETT WILLIAMS, JJ., joined.

Edward M. Yarbrough and Andrew J. Ross, Nashville, Tennessee, for the appellant, William Glenn Wiley.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Senior Counsel; Victor S. Johnson, III, District Attorney General; and John C. Zimmerman and Shannon Poindexter, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### FACTS and PROCEDURAL HISTORY

In 1995, the petitioner was convicted in the Davidson County Criminal Court of the first degree felony murder and especially aggravated robbery of Frank Andrews, for which he received concurrent sentences of life without the possibility of parole and twenty-five years, respectively. His convictions and sentences were affirmed by this court on direct appeal, and our supreme court denied his application for permission to appeal. State v. William Glenn Wiley, No. M1999-02487-CCA-R3-CD, 2001 WL 400390, at *1 (Tenn. Crim. App. Apr. 20, 2001), perm. app. denied (Tenn. Oct. 8, 2001).

The petitioner then filed a post-conviction petition, which resulted in the post-conviction court's granting him a new trial based on the trial court's failure to instruct the jury on second degree murder as a lesser included offense to first degree felony murder. After this court affirmed the judgment of the post-conviction court, both the State and the petitioner filed applications for permission to appeal to our supreme court. William Glenn Wiley v. State, No. M2003-00661-CCA-R3-PC, 2004 WL 2185959, at *1 (Tenn. Crim. App. Sept. 23, 2004), perm. app. granted (Tenn. Feb. 28, 2005). Our supreme court granted both applications, reversed the judgment of this court, and remanded for new trials on both convictions. Specifically, the court concluded that the petitioner was not entitled to post-conviction relief on the basis of the trial court's failure to instruct the jury on second degree murder as a lesser included offense because State v. Burns, 6 S.W.3d 453 (Tenn. 1999), did not establish a new constitutional rule that had to be applied retroactively to post-conviction cases, but that the petitioner was denied his constitutional right to effective assistance of counsel because counsel failed to request a jury instruction on second degree murder and failed to pursue and assert the defense of self-defense. Wiley v. State, 183 S.W.3d 317, 330-33 (Tenn. 2006).

Following his retrial, the petitioner was again convicted of first degree felony murder and especially aggravated robbery. The jury sentenced him to life without parole for the murder conviction, and the trial court sentenced him to a concurrent term of twenty years for the especially aggravated robbery conviction. This court affirmed the judgments on direct appeal, and our supreme court denied his application for permission to appeal. State v. William Glenn Wiley, No. M2007-01299-CCA-R3-CD, at *1 (Tenn. Crim. App. Sept. 29, 2009), perm. app. denied (Tenn. Mar. 15, 2010). The State's proof at trial established that the victim was found murdered in Room 309 of the Knights Inn in Nashville, where the petitioner worked as a caretaker and lived in Room 325 with his girlfriend, Michelle Scheffel. Our direct appeal opinion provides the following summary of the evidence presented at the petitioner's retrial:

> Betty Andrews, the victim's mother, testified that the victim, Frank Andrews, moved from Orlando, Florida, to Nashville, Tennessee, . . . with the hope of becoming a famous musician. Andrews said that the last time she

talked to her son was the Saturday before his death. Approximately two weeks before her son moved to Nashville, he received a settlement for his injuries from a car wreck. Andrews stated that her son regularly carried a wallet and a money clip in his pockets. She stated that her son had many health problems throughout his life and that her son had been released from the hospital for a blood clot in his left leg approximately one week before his death. She also said that her son was an alcoholic, was 37, and was approximately five foot seven or eight inches tall and weighed between 130 and 137 pounds at the time of his death. He was in poor health when he moved to Nashville.

Jim Stevens, a lieutenant with the Metropolitan Nashville Police Department's Strategic Development Division, testified that he was a Master Patrol Officer at the time he worked on this case. On June 6, 1995, at approximately 5:00 or 5:30 p.m., he and Officer David Korman, a trainee, were dispatched to Room 309 at the Knights Inn at 1360 Brick Church Pike in Davidson County, Tennessee. Lieutenant Stevens stated that he found the victim's body partially submerged in the bath tub with the head face down in the toilet. At the time, he could not tell whether the victim was male or female because of the victim's long hair and small frame. As they entered the room, he noticed that there was a large blood stain and broken glass on the bed. He noted that the position of the body did not look natural, and he saw a cord and wadded money and a small amount of blood in the tub. There was blood in the toilet, but he did not see any vomit in or around the toilet. He checked the body for a pulse, and then he and Officer Korman backed out of the hotel room. As they were leaving the room, Lt. Stevens said that he noticed that there were also a few small pieces of glass on the floor and a towel with blood on it next to an air conditioner near the door. As they were exiting the room, medical personnel arrived. He accompanied one of the medical personnel to do an examination of the body after telling the individual not to touch anything in the room.

Lieutenant Stevens said it was his job to preserve the crime scene, rather than to investigate it. He positioned Officer Korman in front of the door to the hotel room so that no one other than law enforcement entered the room. He also told Officer Korman to keep a log of the detectives and investigators that entered and exited the room. Once he established the crime scene perimeter at the front door to the hotel room, he called the identification technicians, the homicide investigators, and his sergeant to the crime scene. Once the homicide investigators arrived, they asked him to extend the crime scene perimeter to the entire third floor of the hotel.

Johnny L. Hunter, a retired sergeant with the Metropolitan Nashville Police Department, testified that he was a crime scene investigator at the time that he responded to the scene at the Knights Inn at 6:00 p.m. on June 6, 1995. When he entered the room, he saw a large area of blood and some broken glass on one of the beds. He said the victim was in the bathtub "with his head over the toilet, almost in the toilet." The victim's hair was wet, and he had a significant amount of blood on the hem of his shirt. The victim's pockets had been pulled inside out, and there was a closed pocket knife on the floor near his waist. The bathtub had smears of blood on it, and he observed two cords, a telephone cord and an electrical cord from the lamp in the room, in the bathtub. There was also a footprint in blood at the end of the tub. He also observed a towel with blood on it next to the air conditioner and a broken bottle on the floor outside the bathroom near the beds. He supervised the collection and documentation of evidence from the room. Hunter identified several photographs of the victim, which depicted the victim's face and head with lacerations on the top left temple and lacerations on the back of the head, the victim's hand with blood on it, and the victim's arms with abrasions on his left and right elbows.

Tommy Simpkins, an officer with the identification department of the Metropolitan Nashville Police Department, testified that he arrived at the crime scene on June 6, 1995, and helped collect evidence from Room 309. This evidence included a towel with blood on it, an electrical cord, a telephone cord, money, a pocketknife, and a suitcase. The telephone cord was tan in color and had been tied in knots to form loops. The electrical cord was black in color, had been cut several times, and had been tied in knots. Both cords were found in the bathtub. He said he also took some photographs of Room 325 because it was believed that the suspects may have been staying there. In addition, he collected a pair of size nine work boots with a substance appearing to be blood across the top of one of the toes found in Room 201, which was a floor below where the victim was found. The boots were not sent to TBI to be tested.

Marsha Brown, an officer for the crime scene investigation unit of the Metro Nashville Police Department at the time that she investigated this case, testified that she was called to the Knights Inn on June 6, 1995, to investigate a murder. Upon entering the crime scene in Room 309, she noticed a large pool of blood and broken glass from a juice bottle on the bed closest to the bathroom, broken glass from a juice bottle between that bed and the wall, a broken vodka bottle in front of the dresser, and trash in the room. She also

saw a bloody towel next to the air conditioner. In the bathroom, she saw the victim's body in the bathtub with his head over the commode. The victim had blood on one of his feet. There was also money, an electrical cord, and a telephone cord in the bathtub. She identified the telephone cord in the bathtub as being from the telephone in Room 309. There was a pocket knife on the bathroom floor near the victim. She also collected a bottle of medication and numerous pills found in a suitcase. Officer Brown collected latent fingerprints from a beer can on the night stand and the broken vodka bottle next to the dresser in Room 309. She also investigated Room 325, where she noticed beer cans, beer boxes, and that the beds were made. Officer Brown photographed a pair of work boots in front of Room 201 that appeared to have blood on them. She was unsure whether these boots were ever sent to TBI to be tested. Officer Brown stated that there was no forced entry into Room 309.

Julia Hooper, a police identification supervisor with the Metropolitan Nashville Police Department, was tendered as an expert in fingerprint examination. She determined that fingerprints taken from the broken vodka bottle and a beer can on the nightstand belonged to [the petitioner]. Hooper said that she was never asked to make a comparison of the prints collected with known prints belonging to Scheffel and the victim. She said there were several other identifiable prints taken from Rooms 309 and 325 that did not match [the petitioner's] known fingerprints. These identifiable prints were saved to the AFIS system in the computer so that future matches of these prints could be made.

James Walker, a detective with the Evansville, Indiana Police Department, testified on June 25, 1995, he was notified that [the petitioner] had been arrested at the Arrowhead Motel in Evansville, Indiana. His department notified the Metropolitan Nashville Police Department that [the petitioner] was in their custody, and [the petitioner] was extradited to Nashville.

Larry Flair, a retired detective with the Homicide/Murder Squad Division of the Metropolitan Nashville Police Department, testified that he was dispatched on June 6, 1995, to Room 309 at the Knights Inn. After arriving at the crime scene, he was told that [the petitioner], the caretaker for the motel, and Michelle Scheffel, [the petitioner's] girlfriend, had begun working at the motel on June 1, 1995 and had left the day of the murder. Prior to their departure, [the petitioner] and Scheffel had stayed in Room 325. Flair reviewed the motel's employment records and obtained a copy of [the

petitioner's] employment application from the motel manager. He identified the employment application as the one he received from the motel manager. Flair attempted to locate [the petitioner] at the motel and at some of the addresses listed on his application but was unsuccessful. He was later notified by another officer that [the petitioner's] fingerprints had been found in Room 309. Thereafter, he obtained a warrant for [the petitioner's] arrest, which was loaded on the computerized NCIC system. Shortly thereafter, Flair received notice that [the petitioner] had been arrested in Evansville, Indiana. He then took [the petitioner] into custody in Indiana. Flair identified [the petitioner] for the court.

After receiving information about [the petitioner's] arrest in Evansville, Flair obtained the registration receipt from the Arrowhead Motel in Evansville, Indiana, which showed that [the petitioner] and Scheffel checked into the motel on June 23, 1995. He identified the receipt as the document that he received from the Arrowhead Motel.

Flair said that he took [the petitioner] into custody in Indiana on June 25, 1995. He then obtained permission from Michelle Scheffel to search the room she and [the petitioner] shared at the Arrowhead Motel, wherein he discovered some of [the petitioner's] personal documents. Flair stated that [the petitioner] used his own name, rather than an alias, when he registered for the room at the Arrowhead Motel. Flair also identified a pair of size 11 work boots found in [the petitioner's] room at the Arrowhead Motel. He also identified a second pair of boots found in that motel room, and although they did not have a size on them, they were only slightly shorter than the size 11 boots he had previously identified. Flair stated that the car in the parking lot of the motel was registered to [the petitioner].

Dr. Ann Bucholtz testified that she was the chief medical examiner for Davidson County in June of 1995. She was tendered as an expert in forensic pathology. Dr. Bucholtz performed the victim's autopsy and concluded that his cause of death was blunt force trauma to the head. She observed several lacerations on the victim's scalp area, including one larger laceration and four other superficial lacerations with bruises underneath in the area of the crown. She identified two curved abrasions above the victim's right eyebrow that looked as if they occurred near death or after death. Dr. Bucholtz stated that the victim's injuries were consistent with being hit in the head with a bottle. She also stated that the injuries indicated that the victim had suffered at least two different blows to the head. The victim's neck had no injuries, although

-6-

she found evidence that the victim's neck had been resting against an object. Dr. Bucholtz opined that the injuries to the victim's elbows, hands, and the back of his hands could have been defensive wounds. There was no evidence of a heart attack. There was also no trauma to the neck. She stated that although the victim did not have any physical signs of seizure, this did not mean that a seizure did not occur. She said that it is very difficult to determine whether a person died of a seizure because a seizure is not easily observed and documented in an autopsy. The victim's vascular system was normal, and there was no sign of an aneur[y]sm. There were no signs that the victim died of acute intoxication. Although the victim did not have a fractured skull, he had bruising on the scalp that confirmed the outside bruising she observed on the skin related to the abrasions above his eyebrow. Dr. Bucholtz's microscopic examination also confirmed that the victim died of blunt force trauma. She stated that although the victim had a blood alcohol level of .34, this amount would not necessarily have been fatal to him if the victim was a chronic drinker. Dr. Bucholtz said that she did not recall having information that the victim had a seizure disorder at the time of the autopsy. When asked about whether the victim could have died of positional asphyxia or hanging, Dr. Bucholtz maintained that the victim's cause of death was blunt force trauma. She stated, "[T]here were no other findings I thought were significant in an autopsy to cause the death." Although alcohol or a seizure could have contributed to the victim's death, Dr. Bucholtz said, "[T]he final cause of death in my opinion is still blunt force trauma." She said that she was unable to change her opinion as to the victim's cause of death based on the evidence presented to her during cross-examination.

Michelle Scheffel, [the petitioner's ] former girlfriend, testified that in June of 1995 she and [the petitioner] had a child who was two or three months old. She identified [the petitioner] for the court. She state[d] [that] she and [the petitioner] worked at the Knights Inn for approximately one week before leaving. While they were at the Knights Inn, she met the victim, although she did not know his name. The day they left the Knights Inn, she had seen the victim and [the petitioner] drinking beer in the motel room that she shared with [the petitioner]. She and [the petitioner] got into a "little bit of a physical fight" because she wanted the keys to the car to go get some cigarettes. The victim told [the petitioner] to leave her alone and take his hands off of her, and [the petitioner] let go of her. [The petitioner] and the victim left the room. Approximately an hour later, Scheffel took her baby and went to the victim's room to look for [the petitioner] so that she could get some cigarettes. When she knocked on the victim's room, no one answered the door. When she came

back a short time later and knocked on the door again, [the petitioner] pulled her inside, and she saw [the petitioner] and the victim fighting. Once she entered the room, [the petitioner] and the victim continued fighting, although she could not determine what they were fighting about. Then she saw [the petitioner] hit the victim on the head with a bottle, which knocked him to the floor. Although she did not initially see any injuries to the victim when she first entered his room, the victim began bleeding when [the petitioner] hit him with the bottle. She did not notice any injuries to [the petitioner] while she was in the victim's room. When [the petitioner] hit the victim with the bottle, glass from the bottle shattered everywhere, and Scheffel took her baby back to their room. Scheffel said that she cleaned the victim's room everyday as a part of her job as housekeeper, and she never noticed any cut cords or damaged property. About fifteen to twenty minutes after she left the victim's room, [the petitioner] came to their motel room and told her that the victim was calling the police and that they had to leave. Scheffel said that [the petitioner] owned a buck knife that he carried in his pocket. She also stated that the victim was "a lot smaller" than [the petitioner]. She believed the victim weighed approximately 150 pounds, although the autopsy report said that he weighed 187 pounds.

[The petitioner] never told her what happened between him and the victim after she had left the victim's room. She noticed that [the petitioner] had some small cuts on his knuckles and a few blood splatters on his shirt when he returned to their room. Scheffel grabbed some of the baby's things and went to sit in the car. [The petitioner] packed the rest of their belongings, put them in the car, and they left the Knights Inn to go to Clarksville. They made one stop, where [the petitioner] changed his clothes, and he threw the clothes he had been wearing into the garbage bag full of their belongings. Scheffel also remembered [the petitioner] throwing what she thought was a wallet out of the window. She said that they had only a few dollars when they left the Knights Inn, and she believed that they left the Knights Inn without their paychecks. She and [the petitioner] spent a few nights at a motel in Clarksville before camping for two or three weeks at the Land Between the Lakes. From there, they drove to Evansville, Indiana, and stopped at the Arrowhead Motel. After staying there for a while, she heard a knock on their room at the Arrowhead Motel. She answered the door and saw several Evansville police officers with their guns drawn. They ordered Scheffel to the ground; she told them there was a baby inside, and they lowered their weapons. The officers made Scheffel sit near their police cars and told her to write down everything that had happened because her mother had filed a missing persons

report. When the officers later interviewed her, they told her that [the petitioner] was a suspect in a murder in Nashville, Tennessee. They asked her what she knew about the murder, and she told them that she did not know the victim and did not know anything about his murder, which was not the truth. She talked to [the petitioner] after she talked to the Evansville Police Department because she wanted some answers about what was happening. [The petitioner] told her only that the police had him now, and he was going to prison. [The petitioner] urged Scheffel to stay with his mother, who was at the police station, for a little while, which she did. At about 12:45 a.m. or 1:45 a.m., Scheffel spoke to officers from the Metropolitan Nashville Police Department and again stated that she did not know anything about the victim's murder. She said [the petitioner] never told her what happened between him and the victim in the motel room after she left.

After [the petitioner] was transported to Nashville, Scheffel gave a tape recorded statement to Detective West in Nashville that varied from the other two statements she had given to the Nashville and Evansville officers. She told Detective West that she had seen the victim, and she described what she had seen in the victim's motel room before she left. She explained the reason that she had previously been untruthful to the Evansville and Metro Nashville officers:

> I was scared, in shock, I didn't know what to say. And after, you know, I had time to think about it, it started to wear on me. And [Detective] West, he was, he seemed to be nice, and he told me if I had any information to give him a call and he would sit down and talk with me, and so I gave him a call.

Scheffel admitted that she had been charged with simple marijuana possession several years before, but this charge was expunged after she called a probation officer for six months. She also became aware that she had written three checks to Walmart in 1996 for insufficient funds when she tried to buy a house. She repaid Walmart and was never formally charged regarding the checks.

Scheffel acknowledged that she told Detective George in Evansville that she and [the petitioner] met another couple that were taking over the maid and groundskeeper positions at the Knights Inn and that [the petitioner] told her to pack up her belongings because they were leaving the motel. She also admitted telling Detective West in Nashville that she and [the petitioner] left

the motel because they had met the other couple taking over their jobs, and there was no point in working if they were going to get fired at the end of the week. She also told Detective West that she did not see [the petitioner] hit anyone with a vodka bottle and did not see [the petitioner] throw a billfold out of the window of the car on June 25, 1995.

Glen John Glenn, a special agent forensic scientist with the Tennessee Bureau of Investigation (TBI) Crime Laboratory of Nashville, testified that he generated a report on the substances submitted by law enforcement in this case. He identified twenty-seven tablets as Phenobarbital, a controlled substance. He also identified several exhibits containing pills that were controlled substances, including Methyltestosterone, Lorazepam, and Alprazolam.

Bradley Everett, a special agent forensic scientist with the TBI Crime Laboratory in the serology unit, testified that he was required to test a white towel containing blood obtained by law enforcement in this case. Agent Everett stated that he was asked to compare the blood on the white towel with a sample of [the petitioner]'s blood. After conducting DNA testing, he concluded that the blood on the towel belonged to [the petitioner].

[The petitioner] testified that in 1995 he was twenty-eight years old, and he and Michelle Scheffel were dating and had a young child together. He, Scheffel, and the baby moved to Nashville so that he could look for a job and be closer to his mother who lived in Greenville, Kentucky. They first worked at the Scottish Inn in Nashville. They stayed at this motel for only three days because Scheffel did not like her housekeeping job. Then they began working at the Knights Inn on a one-week trial basis; Scheffel worked as a housekeeper, and he worked as a groundskeeper. Their work paid their rent, and "if there was some extra, we [received] money for it." [The petitioner] said that he and Scheffel discovered that management had hired another couple to replace them at the end of the week. [The petitioner] said that his job required very little work and that he spent most of his free time drinking. He also said that he had a drinking problem at the time and drank a case of beer a day.

[The petitioner] said that he met the victim at the Knights Inn when he was sitting by the pool drinking beer. [The petitioner] and the victim drank together for a couple of hours and then went to the liquor store and bought a bottle of vodka and some beer. They drank in [the petitioner]'s room for a

-10-

while until Scheffel came in the room, and Scheffel and [the petitioner] had a verbal argument. [The petitioner] said, "I have never put my hands on no woman, never been arrested for no domestic violence, or nothing like that." [The petitioner] said he and the victim decided to go to the victim's room to get away from Scheffel. After arriving at the victim's room, they drank Busch beer, Budweiser beer, and vodka. After they had been at the victim's room for an hour, two women that he believed were prostitutes knocked on the door. The victim talked to them a minute, gave them some money, and told them to come back later that night. The victim knew the women, and it appeared that the women had been at his room the night before. [The petitioner] and the victim continued to drink, and the victim had a blackout, wherein the victim asked [the petitioner] to give him some money to buy drugs and believed [the petitioner] was a cab driver. [The petitioner] and the victim started arguing, and then the victim "rushed" [the petitioner]. [The petitioner] said that he was intoxicated at that time, and the victim was angry and intoxicated. [The petitioner] said that when the victim "rushed" him, he hit the dresser with the back of his legs, which made him sit down. The victim was "pushing [him] and swinging, [and [the petitioner]] bowed backwards and . . . was trying to push up off the dresser." [The petitioner] felt the vodka bottle with one of his hands, and he hit the victim one time on the head, but the blow "never phased him." [The petitioner] said the victim continued to swing at him. [The petitioner] hit the victim a second time with the vodka bottle, and the victim fell backwards on the bed. [The petitioner] claimed the vodka bottle did not break until the second time he hit the victim with it. He denied hitting [the petitioner] with the orange juice bottle that was found broken in the victim's room and said he did not know how the orange juice bottle had been broken. [The petitioner] said he hit the victim two times because "[h]e had me off balance, and he was in drunken rage. I mean, it was like [he had] unbelievable strength." Then the victim "raised up" from the bed and tried to say something. [The petitioner] told him he was leaving, and the victim kept trying to talk to him. He saw that the victim was bleeding, and he helped him to the bathroom doorway. [The petitioner] said that he hit the victim with the bottle a second time because "he was attacking me. He was bleeding. After he raised up off the bed, I [saw] he was bleeding. He seemed that he could use some help. I helped him to the bathroom." He said that getting the victim to the bathroom "was the extent of the help he needed" and that the victim walked there on his own. As he got to the bathroom, [the petitioner] noticed his nose was bleeding in the bathroom mirror, and he took a towel out of the bathroom and cleaned the blood off of his nose. He said he did not have any cuts on his hand that were bleeding at the time. He left the victim in the

doorway to the bathroom. [The petitioner] said he did not remember seeing any electrical and telephone cords in the bathtub, and he had no idea how the cords got there. As he was leaving the motel room, he noticed the victim's wallet on the night stand, and he took the wallet and put it in his back pocket. The wallet contained $240, which he removed and put into his own pocket. He threw the towel in the room, picked up his cooler, and left. He said he took the victim's wallet to "get back [at him], drunk, I guess. He done attacked me, he done cost me my job, [so I] just walked over and picked it up." He said that he did not use force to take the victim's wallet because the victim was in the bathroom at the time. [The petitioner] also said that when he hit the victim in self-defense, he did not intend to take anything from the victim. [The petitioner] denied robbing the victim, emptying his pockets, and beating him up. He claimed he hit the victim with a vodka bottle "to get him off of me."

[The petitioner] said that when he left the room, the victim "was alive, he was talking, he was bleeding, and he was intoxicated." He said he helped the victim because he knew what it was like to be a drunk. [The petitioner] took the victim to the bathroom so that he could "clean up, sober up, whatever he needed to do."

When [the petitioner] left the room, he, Scheffel, and the baby headed for Greenville, Kentucky, but Scheffel was driving, and they ended up in Clarksville. While they were driving on the interstate, [the petitioner] took the victim's wallet and threw it out the window of the car along with some paper and some beer bottles. [The petitioner] said he never changed out of his clothes with blood on them before checking into the motel in Clarksville. He said that the clothes he had on when he left the victim's room had been washed with the rest of his clothes, and he kept the shoes he was wearing when he left the victim's room. [The petitioner] said that the boots collected from the second floor of the Knights Inn that were introduced by defense counsel were not his boots. He said that he, Scheffel, and the baby spent one night at a motel in Clarksville and then went to his mother's home in Greenville. Then they went to the Kentucky Lake to camp. He said that he was not worried about the police looking for him after they left the Knights Inn. After they camped at the lake, he, Scheffel, and the baby returned to [the petitioner]'s mother's house. [The petitioner] picked up his unemployment check, and then decided to go to Evansville, Indiana, because it was near his mother's home in Greenville, to see if he could find a job. Once they got to Evansville, they got a room at the Arrowhead Motel, where he was later arrested. [The petitioner] said the officers knocked on the door, he answered it, and they had

-12-

their guns raised and told him to come out of the room. The officers told [the petitioner] they had a warrant for his arrest out of Nashville. He initially believed that this warrant was for theft. As he was taken to jail, an officer told [the petitioner] that he had been arrested for murder, and [the petitioner] told him that they had arrested the wrong person. Once he got to the police station, he was taken into custody by the Nashville police. [The petitioner] believed that his mother told the police where to find him.

[The petitioner] gave a tape-recorded statement to Detective West at the Evansville police station. They talked for an hour and a half before Detective West took a ten minute tape-recorded statement from him. [The petitioner] was then extradited to Nashville.

[The petitioner] acknowledged that he signed the job application at the Knights Inn. He stated that the glass bottle of orange juice was already in the room when they returned from the liquor store. [The petitioner] said that he had never been in the victim's room prior to the time that he hit the victim with the vodka bottle.

Arthur Woods testified that he was in prison at the South Central Correctional Facility serving a seven to eight year sentence. Woods said that he met the victim in Nashville at the Ramada Inn Lounge. The victim told him that he had an audition on Music Row and said he needed a ride. Woods gave him a ride to Kroger and gave him his beeper number in case he needed a ride later. He said that the victim would give him gas money in exchange for transportation. Later, the victim contacted Woods and asked him to bring him a six pack of beer to his room. Woods brought him the beer and talked to the victim for a few minutes. He left, and a short time later, Woods learned that the victim was dead. Woods said that he only went to the victim's room one time. The police interviewed him because they found his beeper number in the victim's room. Woods said that he did not rob or kill the victim. He also said that he did not have a key to the victim's room.

Jeff West, an investigator with the Metropolitan Nashville Police Department in 1995, testified that he and Detective Larry Flair led the investigation in this case. West was dispatched to the Knights Inn on June 6, 1995, and attended the victim's autopsy the next day. West said that Dr. Bucholtz had told him that the victim's cause of death was blunt force trauma to the head. Because of Dr. Bucholtz's findings as to the cause of death, West obtained an arrest warrant for [the petitioner], charging him with the victim's

-13-

homicide. West interviewed [the petitioner] in Evansville, Indiana, where he was arrested. He said that the officers in Evansville tape-recorded approximately five minutes of his interview with [the petitioner], although he talked with [the petitioner] for approximately an hour.

Clifford W. Mann, a former detective in the homicide unit of the Metropolitan Nashville Police Department, testified that he investigated this case in 1995 and canvassed the area around the Knights Inn for witnesses. Mann called Dr. Conavey, who was listed on a pill bottle found in the victim's room, and asked for him to give him a call. Dr. Conavey told Mann that he was treating the victim for high blood pressure, a blood clot in his left leg, and an infection in his left ankle and had prescribed several medications for the victim. Dr. Conavey also told Mann that he believed the victim was addicted to painkillers. Mann also learned that Arthur Woods was acting as a cab driver for the victim shortly before his death. Mann interviewed Woods but was unable to confirm that Woods worked for any cab companies in Nashville. During his investigation, Woods learned that the last time the victim was seen alive was on June 5, 1995. Mann said that he turned all of his information about Arthur Woods and Dr. Conavey over to Detective West.

Dr. Murray Smith, who was tendered an expert in addiction medicine, testified that he was a consultant for the defense in this case. He considered the autopsy report, the testimony from the pathologist, and the drug testing and alcohol testing performed on the victim. He contacted Dr. Conavey, one of the victim's physicians, who told him that he had prescribed two anti-seizure medications, Dilantin and Phenobarbital, to the victim. Based on the date of the prescriptions and the number of pills remaining, Dr. Smith opined that the victim was not properly taking his anti-seizure medication, which put him in a high risk category to have a seizure. He also noted that the victim had an old injury that resulted in a scar on the right frontal lower part of his brain, which could have been the area where the victim's seizures began before spreading to the rest of his brain. He said that the toxicology report showed that the victim had a blood alcohol level of .34, which was over four times the legal limit. Dr. Smith stated that the victim was an alcoholic, and it was common for alcoholics to have seizures. He also stated that an alcoholic can have a seizure as they are going through withdrawal from the alcohol, even though they still have alcohol in their blood stream.

Dr. Smith stated that people who have major motor seizures often start thrashing or jerking, so it is important that they are positioned so that they can

easily breathe. He also said that alcohol is a respiratory depressant, which makes a person less aware that they are not getting enough oxygen. He said that the position of the victim in the bathtub with his head over the edge of the toilet bowl was an unnatural position that could have compromised his ability to breathe. Dr. Smith stated that the combination of the victim's stress about the injuries and bleeding, his old brain injury, his high blood alcohol level, and his failure to take his anti-seizure medicine placed the victim in a very high risk category for a seizure. He said that even if the victim had been hit on the head, he still would have been at risk for a seizure. However, he explained that a failure to take anti-seizure medication does not guarantee that an individual will have a seizure. He said that the fact that the victim suffered blunt force trauma to his head made it more likely that he had a seizure.

Dr. O'Brien Cleary Smith, who was a former medical examiner and who was tendered as an expert in forensic pathology, testified that he acted as a consultant for the defense in this case. He reviewed the medical examiner's report, the autopsy report, the motel room investigation, and the records regarding the victim's medical conditions. He stated that Dr. Bucholtz's report showed that it was a partial autopsy, rather than a full autopsy, because it failed to include the areas of the upper neck and tongue. He also claimed that Dr. Bucholtz did not properly document her findings during the autopsy. He felt the investigation of the motel room and the victim's medical history were incomplete.

Dr. O.C. Smith said that because of the victim's unnatural position in the bathtub with his head dangling over the commode, there was a possibility that the victim's breathing had been interrupted because of the compression of his neck. In his opinion, the victim's body was in a "lethal position." He said a person with a high alcohol level in the blood "runs the risk of irritating the heart, and the heart is more likely to enter into a lethal arrythmia." He also stated that alcohol can depress the respiratory system and that if someone has a seizure disorder, this can cause the person to have a seizure. Dr. O.C. Smith said that he did not agree with Dr. Bucholtz's conclusion that the victim died of blunt force trauma to the head. He argued that Dr. Bucholtz "didn't leave enough documentation in there for me to have absolute confidence in what she said she saw."

Dr. O.C. Smith said that the evidence indicated that the victim could have died from spontaneous bleeding into the brain because of his alcoholism, from a subdural hematoma because of anticoagulant therapy, from a second

impact to the head where there was an old injury, from his seizure disorder, or from postural asphyxia. However, he did not believe that the victim died because of alcohol poisoning because the evidence suggested that the victim had a tolerance to alcohol. He argued that Dr. Bucholtz should have removed the victim's tongue during the autopsy because the neck area becomes important because of the position of the victim's body.

Dr. O.C. Smith acknowledged that the information he reviewed indicated evidence of blunt force trauma. He also acknowledged that blunt force trauma can cause an accumulation of blood inside the skull, which could ultimately cause death. After reviewing the histology slides, Dr. O.C. Smith believed that Dr. Bucholtz removed the victim's brain first during the autopsy, which caused him concern:

> [A] classic mistake in forensic pathology, if there is a concern about bleeding in the head, the rest of the body should be opened first, because that pulls the blood down, the liquid blood down and out of the brain tissues, because the danger is, there is a lot of blood up there in the head area, and as soon as you make a cut in there, you can actually induce bleeding into the brain, leaking of blood into the brain but it can mimic things like subarachnoid hemorrhage very easily.

Dr. Bruce Phillip Levy, the Davidson County Medical Examiner, testified that he reviewed Dr. Bucholtz's autopsy in this case. He said that the autopsy was "a fairly typical standard medical examiner autopsy. I didn't notice any particular deficiencies in it at all." He characterized Dr. Bucholtz's work as "a complete autopsy." Dr. Levy concluded that the victim's cause of death was "blunt force injuries to his head" and that his injuries were consistent with being hit over the head at least two times with a vodka bottle. He explained that the evidence he reviewed in this case was not consistent with the victim's dying of a seizure." Dr. Levy admitted that it is impossible to see evidence of a seizure death in an autopsy.

To rebut [the petitioner]'s testimony that he had never hit a woman, the State called Kimberly Wingate and Paul Snyder for impeachment purposes. Kimberly Wingate testified that at 11:00 p.m. on July 18, 1987, [the petitioner] and another man walked up to her car in the parking lot of Ray's Grocery, pulled her out of her car, and threw her on the ground. [The petitioner] then asked her, "What the [f---] do you have to say about that?" Wingate got the

license plate number of the car in which [the petitioner] and the other man left the scene, and she ran into the grocery store.

Paul Snyder testified that at 11:00 p.m. on July 18, 1987, he was in the parking lot of Ray's Grocery when he observed a large man pulling Kimberly Wingate out of her car and throwing her to the ground. Snyder said that this man was later identified as William Glenn Wiley [the petitioner]. The trial court instructed the jury that they were to consider the testimony of Wingate and Snyder only as it related to the credibility of [the petitioner] as a witness and not as evidence of guilt of the offenses with which [the petitioner] was charged at trial.

Id. at *2-11.

Among the issues that the petitioner raised on direct appeal was whether he should be granted a new trial due to various Brady and Tennessee Rule of Criminal Procedure 16 violations that occurred during the course of his trial. Id. at *1. These included the State's delayed disclosure of various items of potentially exculpatory evidence, including the following: evidence that unidentified fingerprints had been collected from the crime scene, which defense counsel did not receive until the first day of trial; evidence that Michelle Scheffel's fingerprints were found on a beer bottle on a night stand in one of the rooms of the motel, which defense counsel did not receive until the first day of trial; evidence of an early interview of Michelle Scheffel in which she denied any knowledge of the victim or the murder, which defense counsel did not receive until the trial; information about videotaped statements of the petitioner and his mother and of the petitioner and Scheffel, of which defense counsel was not notified until the third day of trial; evidence of a detective's supplemental reports about the crime, which defense counsel did not receive until after the detective had already testified; and evidence of the receipt from the Arrowhead Motel, which the State failed to disclose during discovery. Id. at *18-31.

After analysis, we determined that the various Brady and discovery rule violations, viewed individually, constituted harmless error because none was prejudicial to the petitioner's ability to present a defense. We further determined that, although the number of violations in the case was "disconcerting," the various violations, viewed cumulatively, did not result in reversible error. Id. at *27, 33. In a separate concurring opinion, Judge D. Kelly Thomas, Jr., expressed his concern about the "numerous misdeeds" committed by the State during the trial, which, in his view, would have required reversal of the convictions had not the State's evidence against the petitioner been so strong:

The record in this case reveals suppression by the State of a prior

inconsistent statement made by a key State witness. In addition, during the five-day trial, several discoverable documents were delivered to the [petitioner]. Evidently, delayed disclosure was so commonplace that the trial court kept count of the State's apologies. . . .

In light of the strength of the State's evidence at trial, I agree that timely disclosure of the documents and statement in question would not have altered the result. The presence of unidentified fingerprints at the scene of the crime does not change the fact that the [petitioner's] fingerprints are on the murder weapon. Likewise, the [petitioner's] girlfriend's initial denial of knowledge concerning the murder does not change the fact that the [petitioner] admitted hitting the victim in the head with a vodka bottle and taking his money. It is the strength of the State's proof that led to the majority's holding that the cumulative effect of the errors does not require reversal of the verdict. Again, I agree. If the State's proof was less convincing, I would conclude that the cumulative effect of the numerous harmless errors requires reversal. As the trial court admonished the State, "This is not a way to conduct a serious felony trial."

Id. at *43.

The petitioner filed a *pro se* petition for post-conviction relief on August 19, 2010, in which he raised a number of claims. Following the appointment of counsel, he filed an amended petition on July 22, 2011, in which he alleged that counsel were deficient, thereby prejudicing his case, for failing to adequately respond to the State's various evidentiary and discovery violations and for failing to call two exculpatory witnesses at trial: Pamela Warden and Dr. Conavey. The petitioner asserted that he was not trying to "relitigate the issues" that were presented on direct appeal but that "the multitude of evidentiary, discovery, and Brady issues that occurred during the trial of this case presented such an obstacle to defense counsel . . . that they were rendered wholly ineffective by their response to the numerous violations."

At the December 1, 2011 evidentiary hearing, Rick Berry, the private investigator who worked with defense counsel on the case, testified that he and his associate conducted three different interviews with Pamela Warden, who knew the victim and provided information to them about his lifestyle and associates. During the course of those interviews, Warden expressed her belief that a prostitute named "Dawn" and a pimp named "Frank" were the perpetrators of the victim's murder. Berry stated that Warden was unable to provide any more identifying information about these two potential witnesses. He said he had Warden subpoenaed for trial, but he could not recall whether he was ever asked to personally bring her to the courthouse. On cross-examination, he acknowledged that Warden's brother

informed him that Warden was suffering from Alzheimer's Disease and was addicted to prescription medication. He also acknowledged that Warden was on probation for solicitation to commit first degree murder at the time he interviewed her.

Berry also interviewed Dr. Conavey, a physician in another state who had treated the victim and reviewed his medical records. According to Berry, Dr. Conavey "had seen that [the petitioner] had been prescribed" both Coumadin and "another drug called Keflex," which, if taken together, could "cause massive hemorrhaging." Berry said that Dr. Conavey indicated a willingness to testify at trial that the ingestion of those drugs could have been the cause of the petitioner's death. He stated that he gave his reports of his interviews with Dr. Conavey to trial counsel, but he could not recall if Dr. Conavey was subpoenaed for trial.

Former Metro Nashville Homicide Detective Larry Flair, who was the lead investigator in the case, testified that at the time of the victim's murder, the area surrounding the Knights Inn and other nearby motels was known for prostitution and "things of that nature." He said that when he arrived at the crime scene, he found the deceased victim in the bathroom with his head partially inside the rim of the toilet and the pockets of his pants turned inside out, which made it appear that he had been the victim of a robbery. The scene was "pretty bloody," and the victim appeared to have sustained blunt force trauma to the head. The petitioner and his girlfriend were developed as suspects, and the petitioner was subsequently arrested in Indiana. Flair testified that the petitioner gave him an incriminating statement at the time of his arrest, the essence of which was that he had struck the victim in the head with a bottle and taken his money but that the victim had been fine when he left his motel room. He agreed that trial counsel was successful in having that statement suppressed at trial.

Trial counsel, who had been licensed to practice law in California in 1995 and in Tennessee in 1997, testified that she had practiced criminal law in California, clerked for a judge in Tennessee, worked for the public defender's office in Tennessee, and, since 2001, been engaged in the private practice of law in Tennessee with her primary focus on criminal defense. She was appointed to represent the petitioner in his post-conviction following his initial conviction and was then appointed to represent him in the retrial of his case, with another, newer attorney assigned to assist her. She had received her death penalty qualification by the time of the petitioner's retrial, and the petitioner's was the fourth or fifth homicide trial that she had handled.

Trial counsel was unable to remember many of the specifics of how she reacted to each piece of late-disclosed evidence, given the number of years that had elapsed since trial, but she was able to recall that the State's repeated late disclosures had angered her and "stressed [her] out." She agreed that the State's numerous late-disclosures "took [her] out

of [her] game" and testified that, in hindsight, she could have perhaps "more cleanly objected" and made more motions for continuances and mistrials. Overall, though, she thought that she did the best that she could and "put on a pretty good fight." She also explained that she was conscious of trying to "keep [her] cool" and avoid being seen by the jury as continually stopping the trial and being "the obstructionist."

As for her reaction to specific pieces of late-disclosed evidence, counsel conceded that she should have asked for a mistrial or a continuance in order to have the unidentified latent prints that were recovered from the crime scene run through the police department's database to see if they matched anyone with a history of a violent crime. She could not recall the specifics about Michelle Scheffel's fingerprints on a beer bottle on a motel room nightstand, but she did recall not having been informed until trial that Scheffel had given an early statement denying that she was in the victim's room. Counsel acknowledged that she was unsuccessful in her attempts to have Scheffel's entire testimony excluded in light of the late-disclosed statement and conceded that she might have been able to impeach Scheffel's credibility with the fingerprint evidence from the bottle, had it been recovered from the victim's room. She could not remember why she did not recall either Scheffel or the police identification officer in order to determine where the bottle with Scheffel's fingerprint had been found. She explained, however, that it was difficult for her in the midst of trial to recognize or react to the significance of every piece of late-disclosed evidence: "I think that . . . I was pushing through, in some respects, as best as I could. The ability to stop and completely appreciate the seriousness of how I could use those little pieces of evidence that were thrown mid-trial, I am not sure I was able to."

Trial counsel testified that the videotape of the petitioner speaking with Scheffel and his mother might have been useful had it been audible, but as she recalled it was "messed up" and unable to be repaired. She could not recall whether she moved for a mistrial following the State's late disclosure of the videotape but conceded that she should have done so. She said she would not have recalled Detective Flair to attempt to impeach him regarding the damaged videotape because, as a State's witness, he would have been "a dangerous witness to put on." For the same reason, she did not recall him to question him about his late-disclosed supplemental reports.

Trial counsel could not remember why she did not call Pamela Warden as a witness but speculated that it might have been because she had not shown up, that she had shown up but been "a mess," or that much of what she had to say would have been inadmissible hearsay. Trial counsel also could not specifically recall if she and her investigators tried to locate the prostitute and pimp that Warden mentioned, but she thought that they would have made the attempt. As for Dr. Conavey, she recalled that one of the medical experts she called as a witness, Dr. Murray Smith, had spoken to Dr. Conavey and may have even had access

-20-

to his reports. In addition, both Dr. Murray Smith and Dr. O.C. Smith testified about the victim's poor state of health and offered their opinions about potential causes of death other than blunt force trauma. In hindsight, however, she thought she should have called Dr. Conavey as an additional medical expert at trial.

A former assistant district attorney who was assigned to the petitioner's original post-conviction case testified that she handled trial counsel's request for discovery by inviting trial counsel "to come and have full access to the file." She said that the only thing she would have removed from the file was her or a fellow assistant district attorney's personal work notes.

The assistant district attorney who served as junior trial counsel at the petitioner's 2007 retrial testified that she was assigned to the petitioner's case shortly after she joined the Davidson County District Attorney's Office in 2006, which followed four and a half years spent in private practice, a number of years as a staff attorney for the Tennessee Court of Criminal Appeals, time spent as an appellate law clerk, and work as an assistant district attorney for the Gibson County District Attorney's Office. She said she spent the first two to three weeks after her assignment organizing the voluminous case file. She stated that she responded to trial counsel's discovery requests to the best of her ability and spent considerable time and effort arranging for trial counsel to view the exhibits that were kept at the property room of the police department. The witness explained that she and the lead prosecutor were not aware of the card of latent fingerprints, which had apparently been kept at the ID Section of the police department, until the ID officer began testifying about them at the trial. She stated that they were similarly unaware of Detective Flair's supplemental reports until she realized, during his testimony, that he was testifying from reports that she had never seen and that were not, to her knowledge, ever in the State's file. As for the videotapes of the petitioner's and Scheffel's interviews, she found manilla envelopes containing VHS tapes in the file, which, upon examination, were not functioning properly. She testified that she never removed anything from the file and that she assumed trial counsel was aware of those videotapes because they were in the boxed materials to which trial counsel had access.

At the conclusion of closing arguments, the petitioner's post-conviction counsel moved for the court to order the State to have the unidentified fingerprints analyzed. The court denied the motion and, on December 16, 2011, entered a written order denying the petition for post-conviction relief. Among other things, the court found that the petitioner failed to show that counsel was deficient in her responses to the late-disclosed evidence or in her failure to call the additional witnesses at trial or that he was prejudiced as a result of counsel's alleged deficiencies. The court further found that the petitioner was not denied the effective assistance of counsel under the Cronic standard because it was clear from the record

that "the prosecution's case was forced by trial counsel to 'survive the crucible of meaningful adversarial testing.'" This appeal followed.

## ANALYSIS

### I. Post-Conviction Standard of Review

Post-conviction relief is available to a petitioner who establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. Id. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the post-conviction court "are entitled to substantial deference on appeal unless the evidence preponderates against those findings." Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001); see also Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review is of purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a post-conviction court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields, 40 S.W.3d at 458; Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

### II. Ineffective Assistance of Counsel under Strickland

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. See U.S. Const. Amend. VI; Tenn. Const. art. I, § 9. Ordinarily, to establish that he was denied the effective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so

-22-

serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686.

The prejudice prong of the Strickland test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

### III. Presumed Prejudice under Cronic

In limited circumstances, a petitioner may be able to show that he was denied the effective assistance of counsel without the necessity of inquiring into the actual conduct of the trial. Cronic, 466 U.S. at 660. In Cronic, the United States Supreme Court identified three scenarios involving the right to counsel where the circumstances are "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." 466 U.S. at 658 (footnote omitted). In these circumstances, a presumption of prejudice is justified without the necessity of inquiring into counsel's actual performance at trial. Id. at 662. These scenarios are: (1) situations involving "the complete denial of counsel," where the accused is denied the presence of counsel at "a critical stage" in the proceeding; (2) situations where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing;" and (3) situations where "counsel is available to assist the accused during trial, [but] the likelihood that any lawyer, even a fully competent one, could provide

-23-

effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." Id. at 659-60.

The Cronic Court listed five factors that are "relevant to an evaluation of a lawyer's effectiveness in a particular case" although it noted that "neither separately nor in combination" were they determinative of the issue of whether competent counsel was able to provide the defendant with "the guiding hand that the Constitution guarantees." Id. at 663. These five factors are: (1) the time afforded for investigation and preparation; (2) the experience of counsel; (3) the gravity of the charge; (4) the complexity of possible defenses; and (5) the accessibility of witnesses to counsel. Id. at 662-66.

"Under the third category of Cronic, the presumption of prejudice applies in limited, egregious circumstances." Fuller v. Sherry, 405 F.App'x 980, 985 (6th Cir. 2010). The petitioner argues that his case fits this limited third Cronic scenario, asserting that of the five Cronic factors, all but the second weigh strongly in favor of a finding that his trial was rendered so inherently unfair and fundamentally flawed by the State's systematic late disclosure of exculpatory evidence that his trial counsel, despite her extensive experience and skill, was simply unable to respond or function as an effective advocate. The State responds by arguing, *inter alia*, that a finding of presumed prejudice under the third Cronic category is appropriate only in very rare, egregious circumstances, such as those present in Powell v. Alabama, 287 U.S. 45 (1932), which is the only case where the United States Supreme Court has found a presumption of prejudice warranted under the third Cronic category. We agree with the State.

The United States Supreme Court concluded that the circumstances in Powell were of such a magnitude that "the likelihood that any lawyer, even a fully competent one, could provide effective assistance [was] so small that a presumption of prejudice" was appropriate. Cronic, 466 U.S. at 659-60. Those circumstances, as described by the Cronic Court, were:

> The defendants had been indicted for a highly publicized capital offense. Six days before trial, the trial judge appointed "all the members of the bar" for purposes of arraignment. "Whether they would represent the defendants thereafter if no counsel appeared on their behalf, was a matter of speculation only, or, as the judge indicated, of mere anticipation on the part of the court." [Powell], 287 U.S., at 56, 53 S. Ct. , at 59. On the day of trial, a lawyer from Tennessee appeared on behalf of persons "interested" in the defendants, but stated that he had not had an opportunity to prepare the case or to familiarize himself with local procedure, and therefore was unwilling to represent the defendants on such short notice. The problem was resolved when the court decided that the Tennessee lawyer would represent the

-24-

defendants, with whatever help the local bar could provide.

> "The defendants, young, ignorant, illiterate, surrounded by hostile sentiment, haled back and forth under guard of soldiers, charged with an atrocious crime regarded with especial horror in the community where there were to be tried, were thus put in peril of their lives within a few moments after counsel for the first time charged with any degree of responsibility began to represent them." Id., at 57-58, 52 S. Ct., at 60.

> This Court held that "such designation of counsel as was attempted was either so indefinite or so close upon the trial as to amount to a denial of effective and substantial aid in that regard." Id., at 53, 53 S. Ct., at 58. The Court did not examine the actual performance of counsel at trial, but instead concluded that under these circumstances the likelihood that counsel could have performed as an effective adversary was so remote as to have made the trial inherently unfair. Powell was thus a case in which the surrounding circumstances made it so unlikely that any lawyer could provide effective assistance that ineffectiveness was properly presumed without inquiry into actual performance at trial.

Id. at 660-61 (footnotes omitted).

The Cronic Court noted that not "every refusal to postpone a criminal trial" will "give rise to such a presumption" and that no such presumption of prejudice was warranted in Avery v. Alabama, 308 U.S. 444 (1940), a capital case in which counsel was appointed only three days before trial, because the evidence and witnesses "were easily accessible to defense counsel" and "the circumstances did not make it unreasonable to expect that counsel could adequately prepare for trial during that period of time." Id. at 661. The Cronic court, likewise, concluded that the circumstances surrounding Cronic's case were not of such a magnitude as to warrant a presumption of prejudice. Id. at 666. These circumstances included the fact that the defendant, who was charged with federal mail fraud, was appointed as counsel a young attorney whose principal practice was real estate law, who had never before tried a case before a jury, and who had been given only twenty-five days to prepare for trial. Id. at 662-66.

In support of his argument that he is entitled to a presumption of prejudice under the third Cronic category, the petitioner attempts to distinguish his case on its facts from Fuller, in which the Sixth Circuit Court of Appeals concluded that, despite defense counsel's late appointment to the case, no presumption of prejudice was warranted due in part to the fact that the case was "fairly straightforward, and witnesses and evidence had already been

-25-

identified." 405 F.App'x at 989. The petitioner also seeks to identify his case with Hunt v. Mitchell, 261 F.3d 575, 583-85 (6th Cir. 2001), in which the Sixth Circuit Court of Appeals found presumptive prejudice under the third Cronic category due to the fact-intensive nature of the case and defense counsel's limited time to prepare.

The defendant in Fuller was appointed new counsel at his request only one hour and twenty-eight minutes before jury selection began in his state criminal trial for resisting and obstructing a police officer, criminal sexual conduct in the fourth degree, and marijuana possession. 405 F. App'x at 981. The trial court granted a one-hour recess following the selection of a jury but declined the defendant's late discovery requests and motion for an adjournment. Id. at 981-82. Following his conviction, the defendant filed a petition for writ of habeas corpus in which he argued that he was entitled to a presumption of ineffective assistance of counsel because it was "unlikely that any attorney could [have] provid[ed] competent representation with so little preparation time." Id. at 981.

In affirming the denial of the petition, the Sixth Circuit Court of Appeals analyzed the circumstances of the case under the five Cronic factors. The Court noted that although the short time counsel was given to prepare was "striking," counsel was an experienced attorney, the defendant was represented at the arraignment and preliminary examination by former counsel who "[p]resumably" would have identified witnesses and evidence, the charges were less serious than those faced by the defendants in Powell and other cases, and the case was relatively uncomplicated. Id. at 988-89.

The defendant in Hunt was convicted in Ohio state court of felonious assault and domestic violence following a jury trial in which the court appointed counsel on the day of trial and refused counsel's request to confer with his client before proceeding to voir dire. 261 F.3d at 577. The Hunt Court concluded that Hunt's was "one of those rare cases" in which the presumption of prejudice was appropriate due to the late appointment of counsel and the fact that counsel was denied the opportunity of consulting with his client or conducting any discovery or independent investigation of the facts. Id. at 585. In reaching this conclusion, the court observed that a defendant "'is effectively denied his constitutional right to assistance of counsel'" when "'counsel has no acquaintance with the facts of the case and no opportunity to plan a defense.'" Id. at 585 (quoting Chambers v. Maroney, 399 U.S. 42, 59 (1970) (Harlan, J., concurring in part and dissenting in part)).

The charges against the petitioner in the case at bar were serious and the theories of defense relatively complex. However, in contrast to Powell, Fuller, and Hunt, trial counsel, an experienced and skilled defense attorney, was appointed well before the start of the trial. Counsel, in fact, was initially appointed to represent the petitioner in his original post-conviction proceedings before being appointed to represent him in the retrial of his case.

There is no suggestion that counsel was prevented from meeting with the petitioner or was unable during the lengthy time that elapsed pretrial to investigate and familiarize herself with the essential facts of the case or to plan and prepare an adequate defense. At the evidentiary hearing, counsel described her extensive efforts in preparation for the case and expressed her opinion that she and her colleagues had "worked [the] case to death."

We have no doubt that counsel was "t[aken] out of [her] game" by the State's repeated disclosures of various items of potentially exculpatory evidence during the trial. The late-disclosed evidence was not, however, of such a nature as to require counsel to change her theories of defense or the manner in which she presented the case. Counsel was not, for example, forced to abandon her defense theory of the petitioner's having acted in self-defense, the victim's having died from something other than blunt force trauma, or the victim's having been killed by another individual or individuals who entered the motel room after the petitioner's departure by the State's late disclosure of the broken and irreparable videotape, Detective Flair's supplemental report, Michelle Scheffel's statement denying knowledge of the crime, or evidence of Scheffel's fingerprints on an unbroken beer bottle and unidentified fingerprints at the crime scene.

With respect to the unidentified fingerprints, which the petitioner asserts could have helped support his theory of another perpetrator, we note, again, Judge Thomas' concurrence to the direct appeal opinion that "[t]he presence of unidentified fingerprints at the scene of the crime does not change the fact that the [petitioner's] fingerprints are on the murder weapon." William Glenn Wiley, 2009 WL 3103768, at *43. Indeed, in light of the undisputed character of the motel and neighborhood in which the victim was murdered, we think it would be surprising if unidentified fingerprints, or even bodily fluids, had not been found in the motel room. We also note that the petitioner failed to request that the fingerprints be run through the police department's database until late in the evidentiary hearing and, thus, was unable to show that they could have been matched to any offender or that they have any relevance to the crimes.

In sum, we conclude that the circumstances of this case do not rise to the egregious level required for a finding of *pro se* prejudice under the third category of Cronic. The petitioner is not, therefore, entitled to post-conviction relief on the basis of his claim of presumed prejudice.

## IV. Claims of Ineffective Assistance under Strickland Test

The petitioner also contends that trial counsel provided ineffective assistance under the Strickland standard. Specifically, he argues that the outcome of his trial was prejudiced by counsel's failure to adequately respond to the State's late-disclosed exculpatory evidence

and her failure to call Dr. Conavey and Pamela Warden as witnesses at trial. The State responds that the petitioner has failed to show that counsel was deficient in her responses or actions or that the petitioner was prejudiced as a result of any alleged deficiency in counsel's performance. We, once again, agree with the State.

In denying relief on the basis of these claims, the post-conviction court found, among other things, that trial counsel "offered a reasoned explanation of why she could not or did not show prejudice" as a result of the State's late disclosures of evidence. The post-conviction court noted that trial counsel explained her belief that Dr. Conavey's testimony would have been redundant to that of the two medical experts that she called at trial, each of whom cast doubt on the medial examiner's findings as to the victim's cause of death. The court further found that the petitioner failed to show that the identification of the fingerprints found in the victim's motel room would have been helpful to the petitioner's defense or that he was prejudiced by counsel's failure to call Pamela Warden as a witness at his trial.

The record fully supports the findings and conclusions of the post-conviction court. Counsel provided several reasonable possibilities for why Warden did not testify at trial and explained that she chose not to call Dr. Conavey because his testimony would have been redundant to the two medical experts she called as witnesses. She also gave a reasonable explanation for why she did not recall the police detective to the stand to question him about his supplemental reports or the damaged videotapes. Finally, she also explained that, although she thought in hindsight she should have made more motions for continuances or mistrials, at the time of trial she was conscious of not wanting to appear as "the obstructionist" to the jury. We conclude, therefore, that the petitioner has failed to show that he was denied the effective assistance of counsel under the Strickland standard.

### V. Denial of Motion for Continuance

As his final issue, the petitioner contends that the post-conviction court erred in denying his motion for a continuance to have the unidentified fingerprint evidence analyzed. The granting of a continuance lies within the sound discretion of the trial court, and we will not reverse that decision absent a showing of an abuse of discretion. State v. Schmeiderer, 319 S.W.3d 607, 617 (Tenn. 2010) (citing State v. Odom, 137 S.W.3d 572, 589 (Tenn. 2004)). "'An abuse of discretion is demonstrated by showing that the failure to grant a continuance denied defendant a fair trial or that it could be reasonably concluded that a different result would have followed had the continuance been granted.'" Id. (quoting State v. Hines, 919 S.W.2d 573, 579 (Tenn. 1995)).

In denying the petitioner's motion, the post-conviction court concluded that it was "too late in the day" for the court "to grant a motion made at the close of closing arguments

to reopen the proof and also to order a fingerprint examination." As the post-conviction court noted in its ruling, the case had been pending for some time and the petitioner failed to make his request until after closing arguments had already been completed. Under these circumstances, we find no abuse of discretion in the post-conviction court's denial of the motion for a continuance.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the denial of the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE